**EDSON REALTY CO. et al. v. COMMER-
CIAL NAT. BANK IN SHREVE-
PORT et al.**

No. 54.

District Court, W. D. Louisiana,
Monroe Division.

June 3, 1939.

Frank J. Looney, of Shreveport, La., for plaintiffs.

Elmo P. Lee, S. L. Herold, and Sidney M. Cook, all of Shreveport, La., for defendants.

DAWKINS, District Judge.

Plaintiffs, as stockholders in the Commercial National Bank of Shreveport, hereafter referred to as the old Bank, brought this suit against the Commercial National Bank in Shreveport, hereafter called the new Bank, the present and former receivers of the old Bank and Frank D. Lee of Shreveport, Louisiana, to set aside the sale by Paul M. Brown, former receiver of the old Bank, of some 3,951⅝ shares of the capital stock of the Continental American Bank and Trust Company, hereafter referred to as the Continental Bank.

Defendants, Frank D. Lee, Paul M. Brown and the new Bank have moved to dismiss the bill of complaint for the reason it "fails to state a cause of action against them upon which relief can be granted."

The petition sets forth the circumstances of the transfer by the old to the new Bank of all of the former's assets, the going into voluntary liquidation of the old Bank, and the subsequent appointment of a receiver by the Comptroller of the Currency, and the sale by Brown, Receiver, of the stock to Lee and associates, which it is alleged was in reality for the new Bank. Plaintiffs ask that the right to sue for any losses caused by depreciation in the value of the stock be reserved, and in the alternative, if the sale is not set aside for judgment in favor of the present receiver against the new Bank and Lee in the sum of $145,000. Plaintiffs further allege that the receiver and officers of the old Bank have refused to bring the suit.

The grounds for relief or cause of action stated are substantially as follows:

The stock, at the date of sale, consisted of 3,951⅝ shares represented by certificates standing in the name of the new Bank, except 20 shares, issued to O. G. Bell; that 751½ shares stood in the name of R. T. Moore, Trustee, who had indorsed it and was held in the port-folio of the new Bank, and on June 30, 1933, was re-issued in its name "without permission of said Moore"; that 90 shares had been acquired from L. S. Thomas, December 29, 1933, in settlement of his indebtedness to the old Bank, and on the same date was re-issued in the name of the new Bank; that 167 shares stood in the name of the old Bank, and that on December 22, 1933, it was re-issued to the new Bank; that 100 shares were taken from A. R. Johnson, Jr., on December 3, 1932, in settlement of his indebtedness to the old Bank and new certificates therefor issued in the name of the new Bank; that 20 shares were taken from F. L. Dyer in settlement of his indebtedness to the old Bank and re-issued to O. G. Bell, a "Vice-President" of the new Bank; that 2,819⅓ shares stood in the name of R. T. Moore and 4 shares in the name of the Commercial National Company, Inc., but on October 15, 1935, "all of this stock stood in the name of R. T. Moore, Trustee, and was attached to a note originally made by the Commercial National Company, Inc., which name was later changed to the Security National Company, Inc., and that said note was made for money loaned by the Commercial National Bank of Shreveport. On October 15, 1935, this note was called, without any agreement with R. T. Moore, and the note was cancelled and given to the Security National Company, Inc., and on the same date, 2,823⅓ shares of stock were on certificates transferred to a nominee of the Commercial National Bank in Shreveport," and subsequently, on May 26, 1937, re-issued to it; that although Paul M. Brown was appointed receiver on May 21, 1936, and said 2,823⅓ shares were never transferred to him as such, they

were sold on May 26, 1937, "as stock" of the old Bank; that the total of the stock sold, 3,951⅚ shares represented a majority of the stock of the Continental Bank; and that at the time of said sale there were 6,645 shares of the said stock out-standing, "the remaining 355 shares having been taken by the said Bank as payment for debts to it."

Further, that just prior to the sale on May 26, 1937, Brown, Receiver, furnished to the Judge of this Court, to whom he was required to submit the matter for approval, a statement of the financial condition of the Continental Bank at the close of business on May 12, 1937, accompanied by a letter dated May 15, 1937, "which statement showed "Capital, Surplus, and Undivided Profits" to aggregate $986,770.61, and which letter stated there were "7,000 shares of stock" out-standing, and that the stock was worth approximately $125 per share; that there were only 6,645 shares actually out-standing and that based upon said statement they were worth $135 per share; that the said stock (3,951⅚) was adjudicated to Frank D. Lee, Chairman of the Board of the new Bank, on May 26, 1937, and for $127 per share; that the price so received, was "approximately $32,000 less than its real value," based on the fact alone that there were only 6,645 shares out-standing, and the book value shown in the statement furnished the Court and the representations in the letter of the said receiver to the Court that "the book value of the stock represents the actual intrinsic value"; that Val H. Murrell was President and Frank D. Lee was the Chairman of the Board, respectively, of both the new Bank and the Continental Bank on May 26, 1937, and had held these positions "for some years."

Further, that on May 26, 1937, the Continental Bank owned mineral rights in "more than 18,000 acres of land and especially one-half of the mineral rights in over 10,000 acres of land adjacent to what is known as the Bellevue Oil Field of Bossier Parish, Louisiana * * * which were well worth the sum of $100,-000 and which fact alone made the sale of the stock" $60,000 less than its real value which "facts were not disclosed to the Court at the time of the sale."

That prior to the date of the sale, the attorney for a third person, Charles H. Murphy of El Dorado, Arkansas, "who was interested in bidding on said stock" requested permission from Brown, Receiver, "to examine the books and assets of the Continental American Bank and Trust Company," so that "definite information" could be had "to enable him to make a proper bid or participate in such", but was referred to Murrell, who was President of both Banks, as above stated "and who peremptorily refused to grant the request."

That "published statements" of the Continental American Bank and Trust Company on the following dates showed:

| Date | Capital | Surplus | Undivided Profits |
|---|---|---|---|
| Dec. 31, 1932 | $700,000 | $175,000 | $65,530.84 |
| " " 1933 | " | " | 38,985.83 |
| " " 1934 | " | ....... | 25,216.22 |

"That the item 'Reserved for Contingent'" appeared in the:

"Dec. 31, 1933, statement as $58,243.59.

"Dec. 31, 1934, statement as $97,216.49.

"That an item styled 'Capital Debentures' of $250,000 afterward classed 'Preferred Stock' also appeared among the liabilities," but "that such item could not favorably affect the value of the Common Stock since it is an interest-bearing liability."

Further, that after the new Bank had been in control of the assets of the old for more than three years, it "solicited and procured" the appointment of a receiver by the Comptroller on the "theory that it (the old Bank) was an insolvent Bank." That in the contract between the old and new Banks, by which the assets of the former were transferred to the latter, it was provided that no obligation could be compromised or property sold without consent of the Liquidating Committee of the old Bank, unless seven days notice was given to the Committee for stockholders "during which period of time the stockholders shall have the right to redeem * * * at the price of the proposed compromise or sale"; that by procuring appointment of the receiver for the old Bank, the new Bank, "which was the Trustee of the old, * * * placed itself in a position inconsistent with its trust." That the stock, the sale of which is sought to be set aside, was sold under an order of this Court, directing that it be done at public auction after ten (10) days publication in the Shreveport Times

"to the highest bidder for cash, said stock to be sold in its entirety and as a unit for not less than $120 per share * * *, subject to the homologation and approval of said adjudication by the Court." That the said sale was approved by this Court on May 26, 1937, and the decree referred to said stock as "the property of the Commercial National Bank of Shreveport, in liquidation, but issued in the name of the Commercial National Bank in Shreveport as pledgee."

"Plaintiffs show that the said pledgee held, under the terms of the pledge as set forth in paragraph 27 of this complaint, the said 3,951⅚ shares of stock, and no delay of seven (7) days was given before consummation of the sale, although the sale was made as of the bank in liquidation and for the benefit of the Pledgee."

Further, that since the sale of the said stock to the new Bank, public statements have been made showing as of:

June 30, 1937     Resources $ 9,235,653.99

Liabilities

Deposits ..................... $ 8,296,410.49
Capital Stock, Surplus, Undivided Profits .......... 904,130.42
Reserved for Interest, Taxes, etc., Interest Collected, not Earned ......... 35,113.08

Total .............. $ 9,235,653.99

December 31, 1937     Resources $10,631,812.94

Liabilities

Deposits ..................... $ 9,617,579.35
Capital Stock, Surplus, Undivided Profits .......... 947,201.43
Reserved for Dividends.... 42,000.00
Reserved for Interest, Taxes, etc., Interest Collected, not Earned.......... 25,032.16

Total .............. $10,631,812.94

December 31, 1938     Resources $11,374,629.47

Liabilities

Deposits ..................... $10,302,805.49
Capital Stock, Surplus, Undivided Profits .......... 1,010,255.25
Reserved for Dividends.... 42,000.00
Reserved for Interest, Taxes, etc., Interest Collected, not Earned.......... 19,568.73

Total .............. $11,374,629.47

That in his letter to the Judge of this Court under date of May 15, 1937, Brown, Receiver, stated: "I know that most of the earnings of the Bank (Continental) since its consolidation, have been used to remove assets which might be claimed as losses or doubtful" with no explanation of that statement; and that by December 31, 1938, following the sale on May 26, 1937, the said bank showed earnings of $244,-255.25 represented by dividends of $42,000, Surplus of $150,000 and $10,255.25 as Undivided Profits.

Further, that because the stock so sold constituted a majority of the whole and therefore controlled, it possessed an additional value of five dollars ($5) per share.

That analysis of the above statements show that the increased earnings after May 26, 1937, "could not have come from current earnings, but must have come from recoveries on unlisted or assets previously improperly 'removed' and replaced by earnings." That no reference was made in the report of the financial condition of the Continental Bank in the statement of May 12, 1937, or in the said letter to the Court "to the actual market value of stocks and bonds and other assets having market value" held "by said Bank, but only book value shown" and that plaintiffs "are informed and believe" said market value was "at least $60,000 above" what it sold for, and for this reason alone was worth at least $35,000 more than the price paid for the stock.

"38. Plaintiffs show that all of these facts were well known to Frank D. Lee, Paul M. Brown, former receiver, the Commercial National Bank in Shreveport, its President, Val H. Murrell and its managers and directors.

"39. Plaintiffs show that by the publication of statements showing the Continental-American Bank and Trust Company was losing money, and by the refusal to furnish information to prospective bidders about the real status of the assets of the bank, the effect was to chill bids and not to secure full and free competitive bidding at the sale of May 26, 1937, and, therefore, the actual value of the stock was depressed and the successful bidder was able to secure the stock at its own figure to the detriment of the Commercial National Bank of Shreveport.

"40. That all of the said facts show fraud in law.

"41. Plaintiffs show that the published statements of the Continental-American Bank and Trust Company of Shreveport, Louisiana, made on March 31, 1937, showed the said bank to be losing deposits on a

large scale and losing money, and that the refusal of the President of the Continental-American Bank and Trust Company to furnish any definite information as to the status of the bank and the value of its assets, and the failure of the then Receiver, Paul M. Brown, to require that such information be given, had the effect of depressing the auction value of the stock offered for sale on May 26, 1937, chilled bidding and enabled the successful bidder thereat, by reason of preferential information, to secure said stock at his own price."

■ The question presented by the motion to dismiss is, do the facts alleged and recited in substance above, constitute grounds, if proved, upon which this Court could give relief, either by setting aside the sale of the stock, or in damages?

■ Of course, the appointment of the receiver can not be collaterally attacked. The administration of the affairs of the Bank thereafter were subject to the administration and control of the receiver under the direction of the Comptroller of the Currency. If any claim or debt was compromised or compounded for less than its face value, or, if any property, personal or real was sold, it could be done only upon the order of a court of competent jurisdiction. U.S.C.A., Tit. 12, Sec. 192, and authorities cited in the annotations. The petition admits or alleges that the sale of the stock was made under the order of this Court. It was necessary therefore that the plaintiffs alleged facts which clearly show some error, wrong or fraud committed against the old Bank or its stockholders, and the rights of the plaintiffs in this respect are the same as if the suit had been brought by the Receiver as their representative, who, of course, in such matters represents creditors, the corporation and its stockholders. If the pleading can be construed as charging the new Bank or purchasers of the stock and the former Receiver, Brown, with wrong doing sufficient to set aside the sale, then the mere fact that Brown purported to act as the representative of these complainants would not prevent them from seeking relief. Neither would they be bound if he, although acting in personal good faith, had been taken advantage of or deceived by the purchasers. However, fraud or wrong doing is not pre-

sumed on the part of either, and to show cause of action justifying the setting aside of the sale, or for the recovery of damages, the plaintiffs must affirmatively allege a state of facts, which, when considered in their natural meaning and consequence leads the judicial mind to conclude that the assailed transaction should not be permitted to stand.

In the present case there is no specific allegation of error or of intentional fraud on the part of anyone. It is simply charged that what is recited, as above outlined in substance, constitutes "fraud in law."

■ The first thing which appears in the petition indicating irregularity, is the statement that 751½ shares of stock in the name of R. T. Moore, which he had indorsed and was held in the port-folio of the new Bank, was on June 30, 1933, re-issued in the name of the latter, "without the permission of the said Moore." There is nothing in this statement or anywhere else in the pleading, to show that the stock so indorsed was not properly held as a part of the assets of the old Bank, transferred to the new under the terms of the contract by which the latter took them over. If the stock was legally pledged, indorsed and held as security, it could be disposed of in a lawful manner to satisfy the debt for which it was pledged without Moore's consent. However, the stock or the value which it represented was not disposed of until the sale of the whole as the property of the old Bank, in the transaction which this suit assails, and Moore's consent was not required, except and unless the contention, with respect to failure to give seven (7) days notice and opportunity to purchase by the Liquidating Committee, (which will be later considered) is well founded.

■ What has just been said is equally true of the stock taken in from the other parties named in settlement of their debts, and particularly of the 2,819⅓ shares which were attached to the note of the Commercial Company, Inc. (later the Security National Company). This last mentioned large block of stock, constituting more than half of the total, embraced in the sale of May 26, 1937, is specifically alleged to have been attached to a note for money loaned by the old Bank (which obligation was included in the transfer to

the new Bank) and the nearest the allegation comes to charging an irregularity, is that the note for which the stock was pledged was·"called without any agreement with R. T. Moore" in whose name the stock stood as Trustee and "the note was cancelled" and given to the maker and the stock re-issued to a nominee of the new Bank. Here again, when carefully analyzed, there is nothing charged to disclose an improper disposition of the stock, for all of it was later recognized as belonging to the old Bank in the proceedings by which it was sold for the account of the latter. The form merely, of this asset, was changed, and Moore is not here charging any personal wrong done to him and those for whose benefit the stock of the Continental Bank stood in his name, except as stockholders in the old Bank, which necessarily involves the idea that all of the stock belonged to it.

The next charge of irregularity or impropriety is that embraced in the statement that just prior to the sale on May 26, 1937, Brown, Receiver, furnished the Judge of this Court, a statement as to the affairs of the Continental Bank as of May 12, preceding, showing "Capital, Surplus, and Undivided Profits, aggregating $986,770.61," accompanied by a letter to the effect that there were "7,000 shares (of the stock) outstanding" which was worth approximately $125 per share, when in reality there were 6,645 shares outstanding, the other 355 being held by the Continental Bank itself. The mathematical conclusion is then drawn from these alleged facts that this gave the stock a value of $135 per share instead of the $125 represented by Brown or a total of some $32,000 more than it would have had if the whole 7,000 shares had been in the hands of outside stockholders. It is true that the bill alleges "the book value of the stock representing the actual intrinsic value," but nothing is said about the market value or what a prospective purchaser would have been willing to pay, which of course was the serious consideration confronting the receiver and the Court in exercising discretion as to what it should bring. As pointed out by counsel for defendants, if the stock is figured on the basis of the. assets of $986,770.61, there was a clear mathematical error in stating that the stock was worth $125 per share on the basis of 7,000 shares, as was also true

of the petitioner's statement that it should have been $135 per share, if considered as 6,645 shares outstanding. While, as a matter of fact, the error of Brown in presenting the matter to the Court as alleged was not actually discovered, there is nothing charged anywhere in the petition other than the bare allegations of fact, to question the good faith of the Receiver. This circumstance like all the others, is recited with the ultimate conclusion that there was "fraud in law."

The allegation that Murrell and Lee were President and Chairman of the Board, respectively, both of the new Bank and the Continental Bank, carries only the inference that thereby they were enjoying an advantageous position as to information concerning the value of the stock. In the light of the circumstances disclosed by the pleading, I think it should be assumed that the Receiver and Comptroller, in passing upon the question of the desirability of the sale and probable value of the stock, made such investigation of the Bank's assets as was necessary to determine what it should reasonably bring, including the price at which it had. recently sold. When considered in connection with the good faith which the law imputes to them, in the absence of an allegation of actual fraud or error, and when it is remembered that the sale was not by private transaction but at a well advertised public offering, with a minimum price fixed by the Court, the fact of the relationship of Murrell and Lee to the two institutions would appear to have been of little consequence in the absence of some unconscionable act on their part.

The next factual statement in the petition is that the Continental Bank owned mineral rights in "more than 18,000 acres of land and especially one-half of the mineral rights in over 10,000 acres of land adjacent to what is known as the Bellevue Oil Field of Bossier Parish, Louisiana, which were worth the sum of $100,-000", which alone made the price paid for the stock less than its "real value" by $60,000, and which "facts were not disclosed to the Court at the time of the sale." Conceding that this was true, then in view of the advertising of the sale and its making at public auction, the petitioners could have brought to the attention of this Court by intervention or otherwise, these facts;

and if they were known to the Receiver, in the absence of intentional omission, misrepresentation or fraud, as against the purchasers his knowledge was, in law, that of the stockholders whom he represented. The petition in no manner attempts to connect the new Bank or purchasers at the sale with any circumstances indicating an attempt to suppress this information. The receiver could scarcely take advantage of his failure to supply it to the plaintiffs as a basis for setting aside the sale, and neither can they in the absence of bad faith, error or fraud on his part.

We come now to the allegation that, one Charles H. Murphy was "interested in bidding on said stock" and was denied the right "to examine the books and assets of the Continental-American Bank and Trust Company" with the view of bidding on the stock if he thought it advisable. Here again, the allegations are vague, indefinite, and it would seem, fall far short of a charge that Murphy was able and would have bid a better price for the entire stock than was realized, had this information been furnished. It is as consistent to conclude, in so far as the petition discloses, that he might have been interested in only a small part of the stock, or that he was unable financially to pay for the whole. The order of sale had directed that it be disposed of as an entirety, and notwithstanding the public knowledge, including these petitioners, no complaint was made to the Court because of that fact, nor is any made in the present suit. It must be assumed that the Comptroller, the Receiver and the Court thought the sale in a block was advantageous to the estate. The Continental Bank was not itself in the hands of either the Court or the Comptroller through the Receiver, although the latter, by virtue of the control of this block of stock representing a majority, might have in a proper manner, exercised sufficient authority to require the furnishing of such information as was necessary to satisfy themselves as to the value of the stock. No allegation is made that the Comptroller and Receiver were informed that Murphy was able and willing to bid a better price, or that they were requested to exercise such power as they possessed, by virtue of the control of this stock in compelling Murrell or his agents to permit the examination. I think it was necessary that the petitioners allege something more than the bare refusal of Murrell in the absence of a claim of fraud. It is as consistent, in view of the indefinite character of the allegations to say that the refusal was made because of the unwillingness of the President to open the books and records of the Bank to the public. The petition does not even allege that Murphy and his attorney informed either Brown or Murrell that he was "interested in bidding" upon the stock.

Thus far, there is a total absence of any allegation that the stock was sold for less than its market value, or that if the sale were set aside and it should be again offered, it would bring more. It is alleged that the price paid by Lee and associates or the new Bank was $127 per share.

Plaintiffs next alleged in effect that published statements of the condition of the Continental Bank on December 31 of the years 1932, 1933 and 1934 showed aggregate Capital, Surplus and Undivided Profits of $9,405,308.84, $913,985.83, and $725,216.22 (no surplus shown for 1934), respectively, without any showing as to the bearing this might have had upon the unfairness of the sale; and the same is true with respect to the allegations in the succeeding articles of the petition, wherein it is stated that there appeared in the statements of December 31, 1933 and 1934, an item styled "Reserved for Contingent" in the sums of $58,243.59 and $97,949.49, respectively, for those two years. Nor is there any understandable explanation of the allegation that an item styled "Capital Debentures" of $250,000, afterward classed, "Preferred Stock" appeared among the liabilities. All that is said is that it "could not favorably affect the value of the Common Stock of the Bank, since it is an interest-bearing liability."

There does not appear to be anything in the charge that the new Bank "solicited and procured" the appointment of a receiver after it had had charge and control of the assets of the Bank for more than three years, on the "theory that it was an insolvent Bank" and therefore assumed "a position inconsistent with its trust," that would warrant the setting aside of the sale—in fact it is not even alleged that the old Bank was solvent. The Comptroller undoubtedly had the right to decide whether it was insolvent and the consequent propriety of appointing a receiver.

As to the allegation that the contract under which the assets were transferred to the new Bank provided for seven (7) days notice, with the privilege in the Liquidating Committee to meet any proposal for the purchase of an asset, it is sufficient to say, I think, that when this sale was made, the affairs of the old Bank had been in the hands of the receiver for more than a year, and the procedure by which the stock was sold was that laid down by the statute, which superseded the powers of the new Bank in matters of compromise or sale of obligations and assets. In any event, there was ample time and notice of the proposed sale and the bid which was at public auction for these plaintiffs, had they been willing, to appear and make a better offer, or they could have in some way raised the issue of the applicability of this stipulation before the Court, but no allegation is made that they did or were prevented from doing so, but on the contrary the petition in article 29 quotes in full the order of the Court authorizing the sale and fixing a minimum or upset price at $120 per share, "subject to the homologation and approval of said adjudication by the Court."

The statements of the Continental Bank quoted in detail in article 32 of the petition for June 30, and December 31, 1937, and for December 31, 1938, in connection with article 34, show that during a period of little more than a year after the sale, the Bank had earned $244,255.25 and applied it to two annual dividends of $42,000 each, $150,000 was added to Surplus and $10,255.22 was passed to Undivided Profits. It is alleged that these "increased earnings could not have come from current earnings, but must have come from recoveries or unlisted assets previously improperly listed as losses." There is no suggestion that this was brought about through bad faith or misconduct on the part of anyone and the Court is left entirely to infer that something was wrong when the presumption of the law is the other way.

In article 37 of the petition, it is alleged that in the report or statement of the financial condition of the Continental Bank to the Judge on May 15, 1937, Brown made "no reference * * * to the actual market value of the stocks and bonds and other assets having market value" owned by the Bank "but only book value"

and that the "market value of these articles" at the time was at least $60,000 more, which gave the portion of the stock belonging to the old Bank an added value of "at least $35,000 more than the price paid for the stock." It is not charged that Brown knew or suppressed information as to market value, or that he was influenced in doing this by anyone benefitting from the sale. This is the first and only instance in the petition where the plaintiffs charge a market value of any of the assets, and in this instance there is no attempt to set forth the nature, quantity, or proportion of such securities. However, this could be cleared up by a motion for particulars if the allegation otherwise charged facts which in good conscience justified the setting aside of the sale.

Finally, in articles 39 and 41 of the petition, plaintiffs say that by publishing statements showing that the Continental Bank was "losing money" and by refusal to furnish information to prospective bidders about the real status of the assets of the Bank, the effect was "to chill bids and not to secure full and free competitive bidding," and the "successful bidder" because of his advantageous position, and "preferential information" was able "to secure said stock at his own price." These articles are in substance summaries and conclusions which must be considered in connection with the others in which facts are stated as to how the information was sought and refused and the extent to which the figures in the statements show the losing of money. The circumstances of the alleged refusal to allow examination of books and records have already been discussed. The statements alleged upon issued prior to the sale are undoubtedly those embraced in articles 23 and 24 of the petition above referred to, in which the Surplus of the years 1932 and 1933 remained at $175,000 and disappeared from the statement of 1934, while Undivided Profits fell from $65,530.84 in 1932 to $38,985.83 in 1933 and $25,216.22 in 1934. During two of these years, (1933 and 1934) it is alleged that the Bank carried an item "Reserved for Contingencies" in the sums of $58,243.59 and $97,949.49, respectively, which may have indicated, in so far as these particular sums were concerned, a disposition to withhold the passing of earnings to either Surplus or Undivided Profits, in view of the uncertain Banking

conditions which immediately preceded those periods, and of which I think we may take cognizance.

■ There is no mention elsewhere in the petition of the statement "made March 31, 1937", and referred to in article 31, which "showed the Bank to be losing deposits on a large scale and losing money * * *", contrary to what appears with respect to the other statements quoted and referred to above. In any event there is no charge that any of these statements were false or incorrect and the presumption is, in the absence of such allegations, that they were correct.

There being no charge of actual or intentional fraud but simply that the facts alleged "show fraud in law", we must look to the authorities to determine what constitutes "fraud in law."

■ The receiver of a National Bank is the representative of and stands in the shoes of the Bank, its stockholders and creditors, and enjoys all of their rights and is subject to all of the defenses which could be urged against them. Early v. City of Helena, Arkansas, 8 Cir., 87 F. 2d 831. If the old Bank (in the absence of an administrative receiver) had been in the hands of a voluntary liquidating commissioner or committee, who had sold the stock in the circumstances alleged in the complaint, would the allegations of the bill constitute a ground for setting aside the sale? I think not. Nowhere is it alleged that the receiver acted in error or through mistake, or that the defendants, purchasers of the stock, were guilty of fraud or misrepresentation which would relieve the seller in either instance. In the case of a stockholder or ultimate beneficiary of a trust, whether in the hands of a voluntary liquidator or a statutory receiver, there must be a showing of some wrong doing, error or mistake on the part of the seller of which the purchaser has knowledge and takes advantage, or the latter should be charged with intentional deception or misrepresentation, unless the whole transaction, under the circumstances, is so inherently inequitable as to shock the conscience of the Court.

"It is a well-settled rule that a bill in equity must aver facts on which the complainant bases his right to the relief sought: 'Thus before cancellation can be decreed for fraud practiced in the procurement of a deed, the bill must aver facts from which fraud may be legally deduced; averments which merely amount to conclusions on the part of the pleader, as to its existence, being insufficient.' 4 R.C.L. 518; Pratt Land Improvement Company v. McClain, 135 Ala. 452, 33 So. 185, 93 Am.St.Rep. 35." Scott v. Empire Land Company, D.C., 5 F.2d 873, 875.

And again in a case involving a long and complicated statement of facts seeking relief on the ground of fraud, the Court of Appeals for the Second Circuit had this to say: "In pleading fraud it is a well-established rule that the facts relied upon as constituting the alleged fraud must be set out, and not conclusions. A bill seeking relief on the ground of fraud must state the specific facts and circumstances constituting the fraud, and the facts so stated must be sufficient in themselves to show that the conduct complained of was fraudulent. General charges of fraud, or that acts were fraudulently committed, are without avail, unless accompanied by statements of specific facts amounting to fraud. All through this bill may be found general charges of fraud. It must be made to appear by the facts alleged, independent of mere conclusions, that if the allegations are true a fraud has been committed. An allegation that a thing is fraudulent is immaterial unless the allegation fits the facts to which it is applied." Church v. Swetland [2 Cir.] 243 F. 289, 299. See also Cyclopedia of Federal Procedure Vol. 7, p. 367. Sec. 3529 and authorities in the footnotes.

■ This Court will take cognizance of the fact that some of these complainants formed a syndicate for the purchase of this identical stock, and were responsible for its offering for sale by the receiver at the upset price of $120 per share, being that which they had indicated willingness to pay, but at the sale, the representatives of the new Bank bid some $7 per share more than they had arranged to pay, and hence the adjudication was confirmed by this Court. It is true in the plan by which the syndicate expected to acquire the stock, its members had indicated a purpose to allow other stockholders of the old Bank to participate in the proportions which their stock bore to the original capital stock, but as to such portions thereof as were not subscribed the members of the syndicate were to have the benefit of the

price at which the stock would be purchased. These facts, of course, do not appear in the bill and have no controlling effect upon the issue of whether it states a cause of action. However, otherwise, I am convinced that no grounds for either equitable relief or for damages have been alleged. The bill should therefore be dismissed.

Proper decree should be presented.